and we'll give just a couple minutes for counsel to be able to settle this up. Thank you. All right, we'll hear first from Mr. Gardner. Good morning. May it please the Court, Timothy Gardner for the appellant, the family of Cavill Wingo. This case arises from the tragic death of Cavill Wingo, a 36-year-old father of three who suffered a medical emergency while being briefly detained at the Cobb County Adult Detention Center. The officers responsible for Mr. Wingo's care ignored his obvious and dire medical distress and dismissed his pleas for help as messing around, playing games, or acting like an idiot. Instead of securing Mr. Wingo adequate medical care, the officers took him from the very place that could have helped him in the infirmary and removed him to a padded cell reserved for individuals showing signs of self-harm or harm to others. Mr. Wingo did not display any of those signs. The district court in this case granted summary judgment to the defendants on plaintiff's civil rights claims, finding the defendants enjoyed the privilege of qualified immunity because there was no clearly established law requiring defendants to order the detention center's nursing staff to provide medical care or to hospitalize Mr. Wingo. That is not the law. The district court also granted summary judgment for the defendant on plaintiff's state law claim, finding that defendant did not have a causation expert. I'm sorry, that the plaintiffs did not have a causation expert because they struck the plaintiff's causation expert, Dr. Brian Myers, a general surgeon who has been practicing for over 20 years, testimony, finding that it was not reliable. The court abuses discretion in striking Dr. Myers' testimony and finding it not reliable and that Dr. Myers' testimony is probably the most reliable on causation out of any expert that has testified in this case. On the clearly established law question, I looked at some of the testimony in the record and it looks like there's no dispute that the nursing staff told the prison guards that their assessment was that he was just sort of suffering withdrawal symptoms from lack of drugs and was trying to go to the hospital for that reason. Right. I guess that's where we take issue is the fact that there was no assessment. The nursing staff was in the room. However, they never assessed Mr. Wingo. They never took his vitals. They never examined him. They never touched him. Mr. Wingo was showing very severe medical distress. He was fainting in his cell. He fainted three times. He fell out in front of his cell and lied on the ground for nine minutes before they removed him from the infirmary, saying that he was medically clear. They made that decision, not assessment, without ever examining him. It seems like the nursing staff was super negligent and you settled with them, right? We did settle with the nursing staff. What's the basis for saying that the prison guards were supposed to overrule the nursing staff and do something else? What were they supposed to do? In this case, the prison staff, knowing Mr. Wingo's condition, that it was so obviously clear that he was unable to walk, that he was having trouble breathing, that he was unable to stand up on his own, and that he was showing signs of being semi-conscious. The prison staff, at minimum, should have required the nursing staff to evaluate him. The prison staff shouldn't have accepted the nurse's statement and allowed for them not to examine him at all. How does the chain of command work with this? Do the prison guards get to tell the nurses what to do? I don't know. Ultimately, we believe, yes, the sheriff's office, by statute, is ultimately responsible for the health and welfare of the detainees. Ultimately, they have to make sure that the detainees receive adequate medical care. Just because a nurse is in the room doesn't mean the detainee is actually receiving adequate medical care. Do you really want the rule to be that medically untrained prison guards can and indeed should overrule medical staff? I think maybe that would have helped your client here, who obviously was in distress, but I'm not sure that really you'd want prison guards to be able to disregard the conclusions of medical professionals that are tasked with caring for detainees. I agree with you, Your Honor. I don't think that should be the rule. It should not be the rule that prison guards are required to overrule the assessment and treatment diagnosis of medical staff when they actually assess a prisoner or detainee. However, in a situation where the medical staff doesn't take any action to address the needs of the detainee, the prison guards are then in a situation to require the medical staff to perform some level of evaluation, including taking vitals. How do they know and how are they supposed to know what ought to be done, especially in a case like this where withdrawal from drugs creates a range of symptoms? And certainly one of those symptoms is behavior-seeking hospitalization, right? So how are these guards supposed to know that the nurses hadn't effectively evaluated this patient? Well, the guards were there the entire time that the nursing staff was there, and the video evidence shows us that the nursing staff never went over to evaluate Mr. Wingo. The guards were able to hear Mr. Wingo say, I can't breathe, I'm having difficulty breathing. They were able to observe him unable to stand up on his own. They observed him falling to the ground. They observed him having the inability to walk. Each of those symptoms alone requires some level of medical response. And in this case, there was no medical response to Mr. Wingo other than the cursory statement that, oh, he's just detoxing. In that situation where the medical staff refuses to evaluate someone in that position, the officers then have a responsibility to say, well, evaluate him first. There's also forms that were in place in this case. Before you put someone in Mr. Wingo's condition in a padded cell reserved normally for people that commit self-harm, there's a medical evaluation that has to take place. That wasn't done in this case. That close observation form wasn't filled out. That form requires that vitals be taken and a medical assessment be done. And when the guards are there and they can see that no medical assessment has been done, one, it's improper to remove him from the only place that could save his life. But two, they have an obligation by statute and prior case law to make sure that the nurses perform their duties. In Melton v. Foster, Melton v. Abstinence, sorry, the court found that both medical providers and prison officials can both be found to be deliberate and indifferent. There can be sufficient evidence to allow a case to go to the jury that for them to decide that both prison officials and medical staff can both be deliberately indifferent. That is the case here. In Melton v. Abstinence, that was a situation where someone broke their arm. The jail officials evaluated him. He needed a surgery. They didn't have the surgery. I'm sorry, the medical officials evaluated him. The jail officials also knew about the fact that he needed surgery, and they didn't make sure that he had the surgery. So that's a situation that's very similar to this case in that both the medical providers and the jail officials knew, could see, that it was obvious that the person needed medical attention and didn't provide that medical attention. So those are the situations that the law should require that more should be done. Are you familiar with the Townsend v. Jefferson County case from this court from 2010? Yes, Your Honor, I am familiar with that case. I don't think I saw it in the briefs. As you know, in that case, a pregnant woman was arrested while under the influence of crack cocaine. After she was admitted to jail, she began to experience abdominal pain and vaginal bleeding. She notified deputies and eventually saw a nurse. When the nurse determined that her situation was not an emergency and sent the detainee back to her cell, eventually confirming that the situation was not emergent, and hours later the detainee suffered a miscarriage. But ultimately, the deputies got qualified immunity because they had been told by a medical professional that the detainee was not presenting an emergency. How is this case different than that one? Well, in Townsend, the nurse actually did go and see and speak with the detainee who was experiencing some level of potentially a miscarriage. It wasn't as obvious that this person was suffering the medical distress as in Mr. Wingo's case. In Townsend, she wasn't having trouble breathing. She wasn't fainting. She wasn't having difficulty walking. She wasn't able to ambulate from one corridor to the other. In that case, she was spotting. The nurse evaluated that and said, I'm going to contact a doctor. She did do some level of medical assessment on the patient and communicated to that. But also in Townsend, as stated in Foster v. Maloney, which is an unpublished opinion, and the district court actually cited that case in their order, the court in Townsend left open the situation where the officers could have some knowledge, some subjective awareness of the seriousness of someone's medical condition where they are required to go beyond just informing the nursing staff of this person's medical situation. So we think Townsend opens the door for this type of situation where there's a certain level of subjective knowledge that requires the officers to do more. If someone is obviously having medical distress to the point where they are in dire medical need, then more has to be done. And when the nurses fail to act, as in this case, like there's no testimony that the nurses took the vitals of Mr. Wingo. There's no testimony that they examined him. There's no testimony that they even went up to him and talked to him. From afar, they made a decision, oh, he's just detoxing, without even ever evaluating him. Well, that's beyond—I mean, that's not what they should have done. That is gross negligence. But the officers in that situation observing that gross negligence should have required it. Just as though as if—if you look at the—the officers are essentially the guardians of the detainees. They are responsible for their medical care. Just as though a guardian is responsible for their ward. If a—if you have someone who is suffering a severe medical emergency and you take them to the hospital and the standard is the same as in a hospital just as it is in a jail infirmary, and that person is not able to walk, unable to breathe, having difficulty ambulating from one place to the next, appears to be incoherent, is semi-unconscious, and you go into that facility and the nurse from afar says, oh, he looks like he's just detoxing. Yeah, he's fine. He's medically clear. You can release him. And then the guardian takes him and puts him in a closet and allows him to die. They both are showing signs of criminal recklessness that is deliberate and different if they were government actors. We believe that's the case here. We have a situation where the ward was suffering severe medical issues. The prison officials were aware of these severe medical issues, and they allowed the nurses to not so much as even examine him. Had they—if this case was a situation where the nurses had examined him, took his vitals, even talked to him, went up to him, touched him, just to make sure he was okay and actually medically clear and the guards saw that, I think it would be very difficult to argue that the guards were deliberate and different in that circumstance. But in this limited set of facts, it is clear that the guards were deliberately indifferent to his behavior through their actions as well, with them mocking him, horse-collaring him to one chair from the other, and their testimony being contradicted by all of the video evidence in this case showing that he was not fine, which is what the officer said initially, is that he was fine. Thank you, Mr. Garner, and you've reserved three minutes for rebuttal. Thank you. All right, Mr. Jackson. Good morning, and may it please the Court. The question in this appeal is whether each of the four named defendants acted with criminal recklessness when they deferred to the medical staff's judgment that Mr. Wingo was, in their own words, medically okay to be transferred to the infirmary extension. So you would agree, though, that the sheriff has the responsibility statutorily for ensuring that the prisoners get medical care, right? I would not agree that he has a statutory requirement to ensure that they get medical care. I agree that he has a statutory duty to provide medical care. That's what I'm saying. So, yes, I do agree with that, but I also believe that what Georgia law requires the sheriff to do does not factor into the deliberate and different standard for these deputies under a constitutional analysis. Do you agree with Mr. Garner that the nurses did not actually examine? No, I disagree, Your Honor, because when he was admitted to the infirmary, they did take his vitals around 1130, 1145 p.m. the night before he ultimately passed. So they had his vitals, and they continuously observed him in the infirmary. But did they take his vitals any time after the initial admittance? No, they did not, and, Your Honor, for purposes of deliberate indifference, I don't know how we're supposed to expect a layman, a deputy with no medical training, to know what circumstances require vitals to be taken. Well, let me ask you this. Let's say that Mr. Wingo had gripped his heart and all of a sudden collapsed. Maybe a layperson might think that would indicate a heart attack, right? Maybe a layperson would. Okay. Wouldn't we expect in that circumstance for medical personnel to do something other than just observe? Well, it depends. So if a deputy sees someone grab their heart as if they're having a heart attack and they turn to these medical professionals who see the same thing and say, hey, what's going on here? And the medical professionals say, he's fine, and they give a plausible alternative to a heart attack that's less severe. Here's the thing. I mean, we have said, our case law says that even when somebody receives medical attention, if it's obvious, if it should be obvious to a layperson that there's something very wrong with the medical attention, then that doesn't relieve the officer from his duty to make sure that the prisoner obtains medical attention, right? So I'm trying to figure out, because you have just said, unless I've misunderstood, that any time a medical person, a person with some kind of medical training, offers some kind of explanation, even without examining a person, that that takes officers off the hook completely. I disagree, Your Honor. What I said was, depending on the circumstance, and at the end of the day, the officers, you know, they have to be- Well, what's the circumstance? Because what you said was, it depends on what the nurse says, right? Is that the circumstance? Well, I think it would depend on, let's say they have an arm severed, and the nurse says, they're fine. Obviously, they're not. A layperson can see that. If they're lightheaded, if they're stumbling on their feet, and the nurse says, that's detoxing, that's okay, we can handle that here in the infirmary. These officers don't have the medical training to question that specific judgment, which is the facts we're facing, nor do they have x-ray vision to see what's really going on. And were Wingo's symptoms consistent with detoxing? All the testimony we have is that his symptoms were consistent with detoxing. I hear what you're saying, and I would fully agree with you, and I might still, but I think we have to explore it. I would fully agree with you if there were evidence that the nurses actually examined Mr. Wingo. But there's not. I mean, you've just told us that it happened one time when he was admitted, and then they never looked at him again. Even though he was collapsing repeatedly, he wasn't able to breathe, he had all kinds of other problems, he was slurring his words, he couldn't stand up, and they never examined him after that. And so the officers who were with him knew that they never examined him after that because they were there and they saw that the nurses didn't examine him. And so I'm wondering if there's a difference between that situation and a situation where the nurse examines him and says he's detoxing but is wrong. Respectfully, I would suggest that there's a difference, a material difference for purposes of this analysis, between examining and observing, okay? The officers and the medical staff all observed the same thing. These officers are not going to know what symptoms require a hands-on physical examination that might include vitals, that might include touching his abdomen. Okay, well let's get back to my example. Let's say the person grabs his heart, collapses immediately, and looks like he's in significant pain. The nurse stands by and says he's just detoxing. The officer has no separate obligation to take any, to insist, for example, that the nurse check his vitals or something like that? If, in the officer's experience in training, grabbing your heart all of a sudden is inconsistent with the symptoms of detoxing, they might. But that's not the facts we have. The facts that we have is that they were told that the symptoms they observed were a condition that they had seen many times before, and his symptoms were consistent with that description of his condition. Am I wrong about the timeline here? I mean, he's in sort of the general population of the jail, but then he starts exhibiting these symptoms. And on the basis of these symptoms, that's why they take him to the infirmary, right? Correct. And so then when he gets to the infirmary around 11 o'clock, his vitals are taken, the nurses look at him, they talk to him, and they say he's detoxing. They put him in whatever the infirmary cell is, right? Yes. And going back to my point about observation, that time he's behind a glass wall as far away as I am from you right now. And everybody is seeing his condition throughout the night. Because that's the point of being in the infirmary is so the nurses can check you and watch you and that kind of stuff, right? That is. That's correct, Your Honor. And then so through the night, his condition gets worse, I guess you could say, or certainly changes. And then there's evidence in the record that at 5 a.m. he gets breakfast and eats his breakfast. Correct. And then around 7.45, I think, is when the last officer shows up. And then he goes. They take him to the emergency room, what, at 9 o'clock the next morning, something like that? Am I right about that? That's roughly accurate, Your Honor, yes. Did these officers have any training in detox or how to deal with detox? They see it on a day-to-day basis. I can't say if they have training on how to deal with it. I can say that they are trained to defer to the medical staff's judgments. And was there any testimony in the record that to them these symptoms didn't appear inconsistent with detox? Is there anything to address that? They all said that. They all testified that. The nurses testified that, which is why the nurses reached the conclusions that they reached as egregiously wrong as they were. Do we know what examination is ordinarily done when, if any, when detox is suspected? Monitor the patient is my understanding. But what does monitor mean? Watching him through the glass window in the infirmary. And I don't know how often they're supposed to take his vitals under a detox protocol, but they were following a detox protocol. If I could jump to another important part of this, it's not just deliberate indifference, but also qualified immunity, clearly established law. I have not seen any offerings of what clearly established law was violated in these circumstances. I would suggest to the court that it would require prior case law under the Wade II criminal recklessness standard stating that officers act with criminal recklessness when they defer to the medical judgment of medical staff under these circumstances, under similar circumstances. We just don't have that. What we do have is lots of case law from our sister circuits saying that generally officers are entitled to rely on the medical judgments of the medical staff. Can I ask you to address the expert issue? And this is the question I have about this. It looks like – so the district court said, I'm getting rid of this expert under Dahlberg. But it looks like the district court's analysis is really a summary judgment analysis. And what the district court was really saying is that this expert – there's just no evidence on the causation issue because this expert wouldn't say whether – I forget which officer it is. Wilkinson, I believe, is the – Wilkerson is the deputy who is handling – against whom the state law claim is. So Wilkerson is the deputy. He's the last deputy, basically. Right. So it looks like what the district court was saying is that there's no evidence that Wilkerson's failure to do something around 745 the next morning is what caused the death. Well, Your Honor, the evidence – As opposed to a Dahlberg decision. Could you address that? I do think they're enswined. The evidence that was proffered for his causation was Dr. Meyer's opinion that had anyone called 911, this life could have been saved. The reason he got Dahlberged is when we were asking him with respect to timelines that were relevant to each of the defendants whether that decision holds, he said he couldn't make that determination. Right. Okay. And if you can't make that determination, then the evidence that proffered is not reliable. Well, I guess that's the – and that's just sort of the conceptual problem I'm having with this. If the expert is saying – which I've got his testimony in front of me. I mean, he says, like, I don't know, basically. The question is, like, had they done anything at 745, would he have survived? His answer is, like, I don't know. He says, I cannot say that. Yeah. So it's not – usually in Dahlberg, the expert says, I do know, and then that's an unreliable conclusion. Here, the expert is saying, I don't know, can't tell you, don't know. How is that a Dahlberg issue as opposed to just, like, the generic sort of de novo summary judgment, no evidence on an issue? I appreciate the distinction, Your Honor, and it's well taken. I think you might be right that the judge was basically saying this expert is not giving us the testimony we need or you need to get to causation. To the extent his broad statement that had 911 been called, this life could have been saved, I still submit that that is a Dahlberg question because it's being offered for any and all persons in the course of this interaction with Mr. Wingo. Okay. So the way – so the way the district – I think I understand your point. The way – one way to think about the district court's conclusion here is that the expert sort of has this, like, catch-all conclusion that had they called 911, things would have turned out differently. But as to this particular defendant, he can't really defend that conclusion. He really has no – in fact, says he can't. So that's a Dahlberg issue, I guess. Correct. And not just with Deputy Wilkerson, with all the other deputies as well. The district court didn't get into this on whether or not the causation – the fatal causation flaw also defeats the 1983 claims. The judge – the court reached 1983 claims on qualified immunity. But at least for Deputy Wilkerson, yes, you have to have that medical causation evidence under Georgia state law, according to Georgia Supreme Court, and we just don't have it here. But for Wilkinson, though, on the 1983 claims, he never asked a nurse's advice though, right? No, but it was conveyed to him by Deputy Marshall that Mr. Wingo was detoxing. And this is when we have the unfortunate testimony. He was playing games. He was acting like an idiot. No one today says those are appropriate things to say, Your Honor, but I do submit that it shows that she thought he was doing exactly what Nurse Visser told her he was doing, which is trying to get – trying to create a pretext to get to the hospital. That was conveyed to Deputy Wilkerson. That is his state of mind for purposes of his Section 1983 deliberate indifference criminal recklessness analysis. His subjective awareness was that he had a guy playing games based on, you know, secondhand information from the nursing staff. And if the court has no further questions for me, I will rest my argument. I thank you for your time today. Thank you, Mr. Jackson. We'll hear again from Mr. Gardner. I think what's always frustrated me most about this case is when people refer to this situation as just detoxing, as though detoxing is just a hangover that someone can get over. Detoxing can lead to death and does lead to death. The symptoms from detoxing or the symptoms that Mr. Wingo was experiencing is what the issue is here. And the prior case law has looked at people with symptoms like Mr. Wingo and found that medical care is required. Patel v. Lanier is a case where the detainee was passing out in the back of a transportation van. He was vomiting and throwing up. The officer didn't have to know that that person was suffering from heat exhaustion or what the underlying medical condition was. It's the symptoms that were the issue. Here's the issue that I have that I'd like you to address. Usually in these cases, which we see so many of these, it's bizarre how many cases we see like this. It's just nuts. It's like that. They're out in the prison, the general population somewhere. They undergo some problem and the prison guards don't do anything. What's odd to me about this one is that he was taken to the medical unit and he's admitted into the medical unit. And at that point, the guards have identified him as someone that needs medical care. They're providing medical care. It seems like it's the nurse's job to do that at that point, right? In the same way that it seems very odd to say that the prison is responsible if they take him to the emergency room and an emergency room doctor lets him go. I would argue that his symptoms deteriorated over time. And there was a guard in place for the first shift, the night shift, when he first arrived. From 12 o'clock to 6 a.m., there was one guard, Britt McPhee, who is no longer in the case because we cannot establish that he was deliberately indifferent. He wasn't dismissed on summary judgment. We made the decision to voluntarily dismiss him because he wouldn't have the requisite knowledge of the obvious clarity of the symptoms that Mr. Wingo was experiencing in the morning. And that morning's an important time. And the morning is when he started to faint and not be able to walk and said he couldn't breathe. Well, that's when it became obvious that he needed medical attention. And the last thing they should have done was remove him from the infirmary and then put him in a padded cell. On causation, I think it's very important to address this issue. Dr. Myers, who's the most qualified out of any expert to testify on causation in this case, did say repeatedly throughout that deposition that had Mr. Wingo arrived in the ER with vitals, he more than likely would have survived. Now, he was challenged during the deposition to ask questions about specific information that was not available. And so he had to rely on probabilities and say, well, in my experience, I don't have vitals, so I can't tell you what the point of no return was for Mr. Wingo because we don't have the vitals. So at that point, I can't tell you specifically what his survivability rate was without the vitals. However, based on probabilities, in my experience as a general surgeon, he had a 90% chance of survival at onset. And after that, a 2.5% increase in mortality. So at 745, if you just do the math, Mr. Wingo had a 70% chance of survival. This case deserves a jury, not a dismissal. Thank you. Thank you, Mr. Gardner.